**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 24 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 97-6345

EMMETT FRANKLIN McSWAIN,

    Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CR-86-0001-A)

Howard A. Pincus, Assistant Federal Public Defender (Michael Katz, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

James F. Robinson, Assistant United States Attorney (Patrick M. Ryan, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Before **BRORBY** , **EBEL** , and **HENRY** , Circuit Judges.

**HENRY** , Circuit Judge.

    Mr. Emmett Franklin McSwain was convicted after a jury trial of one count

of conspiring to manufacture and distribute piperidine and phencyclidine (PCP) (a violation of 21 U.S.C. § 846), one count of engaging in a continuing criminal enterprise (CCE) (a violation of 21 U.S.C. § 848), four counts of engaging in interstate travel to facilitate narcotics distribution (in violation of 18 U.S.C. § 1952(a)(3), the "Travel Act"), one count of possession of PCP and piperidine with the intent to distribute and aiding and abetting that offense (in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2), and two counts of failing to file federal income tax returns (in violation of 26 U.S.C. § 7203).  He now appeals his convictions, raising claims of (1) insufficient evidence to support his CCE conviction; (2) error in failing to instruct the jury as to the individuals whom Mr. McSwain managed, supervised, or organized in conducting a CCE; (3) error in admitting expert testimony; and (4) prosecutorial misconduct under United States v. Singleton, 144 F.3d 1343 (10th Cir.), ordered reheard en banc and opinion vacated, 144 F.3d at 1361-62 (1998), on rehearing en banc, 165 F.3d 129, cert. denied, 119 S.Ct. 2371 (1999).  He also argues (5) that if the CCE conviction is upheld, the conspiracy conviction should be vacated as a lesser included offense or, in the alternative, that he received an improper sentence on the dual object conspiracy count.  Finally, (6) he raises three issues in a pro se supplemental brief.  For the reasons set forth below, we affirm the CCE conviction, the Travel Act convictions, the PCP convictions, and the tax convictions.  We REVERSE

2

and REMAND with direction to VACATE the narcotics conspiracy conviction and sentence.

## I. BACKGROUND

This case involves an Oklahoma-based piperidine and phencyclidine (PCP) distribution network. In 1986, the government charged Mr. Emmett McSwain [1] along with eight others in a thrity-one count indictment. His codefendants (with the exception of one) were tried in 1986. Mr. McSwain was not tried then because he had escaped from a prior term of custody and remained a fugitive.

Mr. McSwain was re-arrested in 1996 and tried in 1997. His ex-wife, Ms. Linda Jean Williams, [2] provided the bulk of the testimony at that trial. She testified that Mr. McSwain had been incarcerated in August 1982 for conspiracy to manufacture PCP. See Rec. vol. V, at 95. She stated that, beginning at that time and at her husband's direction, she arranged for Mr. Roger Strader, Mr. Walter Roberts, and Mr. Ronnie McSwain (Mr. Emmett McSwain's brother) to make shipments to California of piperidine, a precursor chemical to PCP. See id.

---

[1] Throughout the opinion, we will refer to Mr. Emmett McSwain as Mr. McSwain and to his brother as Mr. Ronnie McSwain or Ronnie.

[2] Mr. McSwain's ex-wife, Linda Jean, had changed her last name to Williams by the time of trial. We therefore refer to her as Ms. Williams throughout the opinion. She should not be confused with Ms. Linda Sue McSwain, the wife of Emmett McSwain's brother, Ronnie. Nor should she be confused with the buyer, Mr. James Williams.

at 97-98. She set up a speaker phone system so Mr. McSwain could communicate with others by phone from prison. See Rec. vol. IV, at 55-56. She also kept a ledger and cash box related to the deliveries at the home of Ronnie McSwain and his wife, Linda Sue. See id. at 64-65. She testified as to the partnership relationship between Mr. McSwain and his codefendant Louie Paul Baez, Sr. and Mr. Baez's wife Marilyn. Finally, she testified as to various piperidine sales she had made to certain buyers. See Rec. vol. V, at 97. These buyers included: A.J. Guillard, Carol Guillard, Wanda Lewis, and James Williams.

Mr. Strader (also known as "Bear"), Mr. Roberts, Ms. Linda Sue McSwain, and three of the buyers also testified at the second trial (Mr. Williams died prior to the trial). Mr. Estes, a friend of Mr. Strader's who subsequently became involved with the piperidine deliveries, also testified.

Mr. Strader testified that, shortly before going to prison, Mr. McSwain taught him and Mr. Roberts how to make PCP, and the three made a batch. See Rec. vol. V, at 242-46. He described a number of piperidine deliveries to California he made at Mr. McSwain's behest, using Ms. Williams as a point of contact after Mr. McSwain's incarceration. See id. at 234-44. He testified that he made PCP with Mr. Roberts and Mr. Estes and recalled taking one trip to deliver piperidine with Mr. Estes. See id. at 249. He stated that Mr. Estes "just got part of the money on the PCP we made. He didn't get any for making the

4

trip." Id. at 251.

Mr. Estes' testimony differed from Mr. Strader's. Although he confirmed having made PCP with Mr. Roberts and Mr. Strader, he testified he had made three to four trips to deliver piperidine with Mr. Strader. See id. at 212-13. He stated Mr. Strader had paid him $500 for each trip and had paid his expenses. See id. Other than that, Mr. Estes stated he had had nothing to do with the money. See id. at 216. He testified that he accompanied Mr. Strader to pick up a barrel and deliver it to Ronnie McSwain's house. See id. at 215. He stated he met Mr. Emmett McSwain only once, see id. at 207, and thought he had met Ms. Williams only once as well. See id. at 216.

Mr. Roberts' testimony paralleled that of Mr. Strader. He described how Mr. McSwain taught him to make PCP and discussed moving a barrel of piperidine, as well as making several sales and deliveries for Mr. McSwain with the help of Mr. Strader. See id. at 193-97.

Ms. Linda Sue McSwain (Ronnie McSwain's wife) testified that the ledger and cash box were kept at her house, and confirmed she had gone to California. See Rec. vol. VI, at 294-95. But, she denied having done anything illegal for Mr. McSwain and gave innocent explanations for her actions. See id. at 305.

As to the buyers, Ms. Guillard testified that she bought ten to fifteen gallons of piperidine from Ms. Williams from late 1982 through 1984. See Rec.

5

vol. V, at 147. She testified that the price was always the same, and she would simply let Ms. Williams know when she wanted to buy some. See id. at 147, 153. She always paid in full, either in cash or by giving Ms. Williams furs, jewelry or cars. See id. at 107-09 (Ms. Williams' testimony), 148 (Ms. Guillard's testimony).

Ms. Guillard's husband, A.J. Guillard, was incarcerated with Mr. McSwain in El Reno and had friends in New Orleans who wanted to obtain piperidine. See id. at 170. He testified that he discussed this with Mr. McSwain, who claimed to have access to piperidine through his wife. See id. Mr. Guillard maintained that Mr. McSwain indicated the operation was his. Mr. Gulliard made two deals with Mr. McSwain for gallon quantities on behalf of his friends. See id. at 170, 173. He did not negotiate a price but gave Mr. McSwain a gold-and-diamond medallion for one deal and "was supposed to owe him some more money." Id. at 171, 174.

Wanda Lewis testified that she spoke to "Linda" and had a discussion with "someone in Oklahoma" regarding the cost and arrangements for one long-distance delivery of piperidine. See Rec. vol. VI, at 287. She stated she received instructions that the chemical could be picked up at a mile marker on a highway, and arranged for someone to retrieve it and leave money in exchange. See id. at 287-88.

6

According to Ms. Williams' testimony, Mr. Williams ( also known as "Unc") purchased six to eight barrels from her, sometimes by the gallon and sometimes by the barrel. See Rec. vol. V, at 81. Ms. Williams stated that when Mr. Williams bought by the barrel, which cost $110,000, "he wouldn't always have that much money," so he would pay over time. Id. at 81-82.

A special agent, James A. Dockery, who had investigated the case for the DEA also testified. He stated that, in his opinion, Mr. McSwain and Ms. Williams were chiefly responsible for the sale of piperidine. See Rec. vol. VI, at 336.

After a four-day trial, a jury convicted Mr. McSwain on all counts. He was sentenced to concurrent, pre-guideline sentences of fifteen years imprisonment on the CCE count, ten years on the conspiracy and phencyclidine counts, five years on the Travel Act counts, and one year on each tax count. The court also imposed a special term of parole of two years on the phencyclidine count.

## II. DISCUSSION

A.     **Sufficiency of the evidence**

Mr. McSwain contests the sufficiency of the evidence to uphold his conviction for operating a continuing criminal enterprise under 21 U.S.C. § 848(c). We review de novo whether sufficient evidence exists in the record to

7

support a conviction, see United States v. McDermott, 64 F.3d 1448, 1457 (10th Cir. 1995), asking "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Apodaca, 843 F.2d 421, 425 (10th Cir. 1988) (quotation omitted). "[T]he evidence presented to support the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." United States v. Garcia-Emanuel, 14 F.3d 1469, 1472 (10th Cir. 1994). [3]

Section 848(c) states that an individual engages in a CCE when:

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter--

> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of

---

[3] We note the government suggests Mr. McSwain raises this argument for the first time on appeal. Mr. McSwain moved, however, for a judgment of acquittal on the grounds of sufficiency of the evidence on the CCE count at the close of trial. See Rec. vol. VII, at 348. Although Mr. McSwain specifically challenged the government's evidence with regard to the "substantial income" requirement, both the government and the trial court considered and reviewed the sufficiency of the evidence with respect to the five person requirement. See Rec. vol. VII, at 349-50, 352-53. Considering this, we find that the issue was properly preserved for appellate review. See Gordon v. County of Rockland, 110 F.3d 886, 887 n.2 (2d Cir. 1997) (issue preserved for appellate review when although defendant did not "mention [the specific issue] to the trial court . . . [the trial judge] intervened and on his own discussed the [specific] issue").

8

<u>management</u>, and

(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c) (emphasis added).

In considering § 848, we give the operative terms "organizer," "supervisor," and "manager" their nontechnical, everyday meanings. <u>See</u> <u>United States v. Jenkins</u>, 904 F.2d 549, 553 (10th Cir. 1990).

> [A]n organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise. The ordinary meaning of the word "organizer" does not carry with it the implication that the organizer is necessarily able to control those whom he or she organizes. Although cases involving well-defined chains of command under the control of a "King Pin" offer the clearest examples of organization, supervision, or management, . . . the necessary showing can plainly be made in the case of a less structured enterprise.

<u>Apodaca</u>, 843 F.2d at 426 (internal citations and quotations omitted). "[A] relationship of supervision is created when one person gives orders or directions to another person who carries them out." <u>Id.</u> (quoting <u>United States v. Stratton</u>, 779 F.2d 820, 827 (2d Cir. 1985)).

The CCE statute thus imposes additional criminal liability for defendants who exercise "differing levels of managerial control and coordination," but the common denominator is the requirement that the defendant play some managerial role. <u>Id.</u> For example, "[w]hile proof of a buyer-seller relationship alone is insufficient to establish a managerial role, additional evidence of formal or

9

informal authority or responsibility respecting a purchaser's conduct may suffice." Jenkins, 904 F.2d at 553 (citation omitted).

The managerial relationship requirement is flexible. "[T]he defendant need not be the dominant organizer or manager of the enterprise; he need only occupy some managerial position with respect to five or more persons." Id. Further, "[t]he defendant's relationships with the other persons need not have existed at the same time, the five persons involved need not have acted in concert at the same time or with each other, and the same type of relationship need not exist between the defendant and each of the five." Apodaca, 843 F.2d at 426.

Finally, a defendant may not insulate himself from liability by delegating authority. Thus, "the defendant need not have had personal contact with each of the five persons involved, . . . [n]or must each transaction with or instruction to those persons organized or managed specifically originate with the defendant." Id. "The mere delegation of managerial and supervisory duties will not defeat an individual's ultimate status as organizer, supervisor, or manager." Id.

With these principles in mind, we proceed to consider Mr. McSwain's argument that the evidence was insufficient to show that he was an "organizer" or "supervisor" or that he occupied a "position of management" with respect to five or more persons. Upon review of the record, we are not persuaded by his contentions.

10

### 1. Mr. Roberts, Mr. Strader, and Ronnie McSwain

First, Mr. McSwain apparently – and correctly – does not contest that the evidence was sufficient to show the necessary managerial relationship as to Walter Roberts, Roger Strader, and Ronnie McSwain. With respect to Mr. Roberts and Mr. Strader, both testified that Mr. McSwain taught them to make PCP before he was incarcerated, and that they transported piperidine for him at that time. See Rec. vol. V, at 185-88; 228-46. They testified they continued to transport piperidine intrastate and interstate and collected payments for him after his incarceration at the direction of his wife, Ms. Williams. See id. at 99, 112, 188, 246. Ms. Williams testified she dealt with both at the direction of Mr. McSwain. See id. at 96-97.

With respect to Ronnie McSwain, the testimony of Mr. Roberts, Mr. Strader, and Ms. Williams showed that he had also transported multiple gallons and barrels of piperidine intra- and interstate, see Rec. vol. V, at 84, 89, and had collected payments for the shipments. See Rec. vol. V, at 98, 252. Mr. Strader and Mr. Estes testified they had dropped a barrel of piperidine at Ronnie McSwain's house. See id. at 215, 252, 255. Ms. Williams testified she kept the drug transaction ledger and cash box at Ronnie's house, and that Ronnie had access to both, explaining specific ledger entries showing Ronnie had taken withdrawals from the cash box to pay for expenses related to the piperidine

11

distribution.  See id. at 64, 83-84.  This evidence is sufficient to enable a rational trier of fact to find beyond a reasonable doubt that he managed Mr. Roberts, Mr. Strader, and Mr. Ronnie McSwain.  See, e.g. , McDermott , 64 F.3d at 1457 (evidence of drug storage and transport and payment collection sufficient to support CCE conviction).

That makes three CCE supervisees.  In order to sustain the conviction, however, the evidence must support the jury's CCE determination with respect to at least two more persons.  For the reasons set forth below, we conclude that the evidence is sufficient with respect to both Ms. Williams and Ms. Linda Sue McSwain.

### 2.    Ms. Williams

Mr. McSwain argues that the jury could not have considered Ms. Williams because the indictment charged Mr. McSwain and Ms. Williams with acting "in concert with at least five    other persons."  Rec. vol. I, doc. 415, at 31 (emphasis added).  He argues that to allow consideration of Ms. Williams among the "other" people would amount to an impermissible constructive amendment of the indictment.  We disagree.

The indictment does not limit the class of individuals from which the "five other persons" might be drawn.  Therefore, it does not expressly preclude

consideration of Ms. Williams with respect to Mr. McSwain. Thus, including Ms. Williams as a CCE supervisee does not constitute a constructive amendment. See United States v. Jones, 801 F.2d 304, 308 (8th Cir. 1986) (affirming two codefendants' convictions on CCE charge and counting second codefendant among those controlled by first codefendant).

As to the evidence, Ms. Williams testified that she operated at the direction of Mr. McSwain: "[Mr. McSwain] would tell me whether it would be okay to sell piperidine to such and such a person for such and such a price, whether or not I should sell an entire 55-gallon barrel of piperidine to James Williams, and who would make the delivery, how they would make it, and how much they would get paid for it." Rec. vol. V, at 96-97. She testified she was responsible for making entries in the ledger and for communicating with various buyers. See id. at 94-95. She set up a speaker phone system so that Mr. McSwain could communicate with others from prison. See Rec. vol. IV, at 55-56. Mr. Roberts and Mr. Strader testified that, after Mr. McSwain's incarceration, they dealt with Mr. McSwain through Ms. Williams. See Rec. vol. V, at 188, 246. Accordingly, a rational jury could infer that Mr. McSwain had the requisite managerial relationship with her.

**3.     Ms. Linda Sue McSwain**

13

At trial, Ms. Williams testified that she kept a ledger, in which she recorded cash withdrawals and deposits, and a cash box at Ronnie and Linda Sue McSwain's house. See Rec. vol. IV, at 62, 64. Ms. Williams testified that Ms. McSwain had access to both the ledger and cash box and that Ms. McSwain had made entries in the ledger. See id. at 65. Ms. McSwain testified that she accompanied her husband, Ronnie, on a trip to California during which they picked up money from Mr. Strader and that Ms. Williams had given them money from the cash box to pay for the trip. See Rec. vol. IV, at 295-99. There was also testimony that some piperidine was stored on the McSwain's property.

From this testimony, we conclude that a rational jury could have found the necessary managerial relationship between Mr. and Ms. McSwain. Although Ms. McSwain had innocent explanations for her participation and it was implied to the jury that she was acquitted of a conspiracy charge in the original trial, we are prohibited from reweighing the evidence. See Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir.1996). On the testimony presented, the jury could have disregarded her explanations as not credible and accepted government's evidence of her involvement. Accordingly, we hold that the evidence was sufficient and a rational jury could have counted Ms. McSwain toward the CCE requirement that Mr. McSwain organized, supervised, or managed five other people.

14

### 4. Conclusion

The government presented sufficient evidence to show that Mr. McSwain managed, supervised, or organized at least five other people. We therefore reject Mr. McSwain's sufficiency of the evidence arguments.

### B. Jury Instruction

Mr. McSwain argues that the district court's failure to *sua sponte* instruct the jury as to which persons should not be considered individuals he managed requires reversal of his CCE conviction. It appears to be an emerging view that "[i]f certain individuals were, as a matter of law, incapable of counting as supervisees, the jury needed to be instructed of this." United States v. Barona, 56 F.3d 1087, 1097 (9th Cir. 1994) (reversing CCE conviction where jury was not given such an instruction). However, in light of Mr. McSwain's failure to adequately raise the issue in the district court proceedings, we conclude that the district court's instructions do not warrant reversal.

"[I]t is the defendant's responsibility to take steps to see that the arguments he would make in the appellate court are adequately preserved at trial." United States v. Roman, 870 F.2d 65, 72-72 (2d Cir. 1989). In the CCE context, "it is incumbent on the defendant to request an instruction that the jury is not to consider those persons as to whom he regards the evidence of supervision as

15

insufficient or at the very least to make an explicit objection to the trial court's instructing the jury that it may consider such persons." Id. (citations omitted). "As an alternative, the defendant may preserve his claim that certain bases are impermissible by requesting that the jury be given interrogatories that will require it to identify the basis for its verdict if that verdict is one of guilt." Id. Mr. McSwain did not take either of these steps. Moreover, he did not object to the instructions that were given. Thus, he raises this issue for the first time on appeal. Consequently, we can only reverse if he shows that there is: (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." Fed. R. Crim. P. 52(b); United States v. Duran, 133 F.3d 1324, 1330 (10th Cir. 1998). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Duran, 133 F.3d at 1336 (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).

With regard to challenged jury instructions, "'error' arises if, considering the instructions as a whole, the jury has been misled. Duran, 133 F.3d at 1330. The error is "plain" if it is "obvious or clear, i.e., if it is contrary to well-settled law. Id. "A plainly erroneous jury instruction affects a defendant's 'substantial rights' if the instruction concerns a principal element of the defense or an element of the crime, thus suggesting that the error affected the outcome of the

16

case." Id. "Finally, the fairness or integrity of a defendant's trial is 'seriously affected' when the defendant has presented substantial evidence in support of an affirmative defense which has been undermined by an erroneous instruction." Id.

Applying this standard, we cannot say that the district court committed plain error by failing to instruct the jury as to which individuals could not be considered CCE supervisees. The prosecution submitted testimony and evidence concerning the participation of each of the individuals it argued could be considered for five persons necessary to trigger the CCE statute. The determination of whether a person was "organized" or "supervised" is necessarily a factual conclusion, and it is the role of the jury to make such factual determinations. See United States v. Dillard, 43 F.2d 299, 307 n.8 (7th Cir 1994) ("[U]nder . . . 21 U.S.C. § 848, the defendant's status as a 'manager' is a question of fact for the jury, and thus, the terms 'managed,' 'supervised,' and 'organized' are interpreted according to their ordinary, lay meaning.") (citing United States v. Mejia-Orosco, 867 F.2d 216, 221 (5th Cir.), cert. denied, 492 U.S. 924, (1989); United States v. Oberski, 734 F.2d 1030, 1032 (5th Cir.1984)). Moreover, the district court instructed the jury on the definition of organizer / supervisor for CCE purposes and correctly gave a "unanimity instruction," informing the jury that "you must . . . unanimously agree on which five or more

17

persons committed the violations." See Rec. vol I, doc. 415 (Jury Instruction No. 36) (emphasis in original). "'[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them .'" Olano , 507 U.S. at 740 (emphasis added) (quoting Francis v. Franklin , 471 U.S. 307, 324, n.9 (1985)); see also United States v. O'Brien , 131 F.3d 1428, 1432 (10th Cir. 1997) (holding that so long as the district court gave a general unanimity instruction and there was not a realistic possibility of jury confusion concerning the acts which support a defendant's CCE conviction, the court will assume that the jury understood it must be unanimous on the specific findings underlying its verdict").

For these reasons, we conclude that the district court's failure to instruct the jury as to which, if any, persons could not have been considered for Mr. McSwain's CCE conviction was not plain error. See United States v. Garcia-Arbrego , 141 F.3d 142, 165-67 (5th Cir. 1998) (rejecting the defendant's argument that the instructions' failure to inform the jury that certain individuals could not be CCE supervisees constituted plain error); United States v. Wilkinson , 754 F.2d 1427, 1432 (2d Cir. 1985) (rejecting, in light of her failure to raise the issue at trial, the defendant's argument that "if there was insufficient evidence to find that any one of the individuals referred to in the indictment was

18

organized, supervised, or managed by [the defendant, the CCE] conviction must be reversed because it would be impossible to know whether the jury relied on that individual in finding the five-person requirement to have been satisfied").

## C.     Admission of Testimony

Mr. McSwain challenges the district court's decision to admit the testimony of Special Agent James A. Dockery. We review a district court's decision to admit expert or lay testimony for an abuse of discretion.     See United States v. Sneed  , 34 F.3d 1570, 1581 (10  th Cir. 1994). "The court's ruling cannot be overturned unless it is 'manifestly erroneous.'"     Salem v. United States Lines Co., 370 U.S. 31, 35 (1962);    Getter v. Wal-Mart Stores, Inc.   , 66 F.3d 1119, 1124 (10th Cir. 1995). Because Mr. McSwain did not object below, we review his claim for plain error.    See Olano , 507 U.S. at 732.

Special Agent Dockery testified that, "it is our contention that Emmett McSwain and his then-wife Linda McSwain were chiefly responsible [for the sale of piperidine]." Rec. vol. VI, at 336. We agree with the government that this testimony was admissible under Fed. R. Evid. 702. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto

19

in the form of an opinion or otherwise." Thus, whether an expert's testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue" is the central issue in determining admissibility.

Here, Agent Dockery testified that he had been employed with the Drug Enforcement Administration from 1970 to 1989, and had been involved with a dozen PCP investigations. Rec. vol. V, at 330-33. He also specifically testified as to the interaction between added legislative reporting requirements and the operations of piperidine distributors, noting, "[W]e were having a lot of trouble tracing them, because people would get the chemicals and we knew they were obtaining the chemicals and they would transfer them across the country or it was a clandestine operation and they would create drugs with 'em." Id.

We have previously concluded that the government may introduce expert testimony as to the roles played by participants in a gambling operation, noting that "other courts have permitted law enforcement witnesses to provide both lay and expert opinions concerning the roles played by participants in a variety of illegal activities . . . ." United States v. Pinelli, 890 F.2d 1461, 1474 (10th Cir. 1989). Given the complexity of the piperidine distribution network, the average person's unfamiliarity with the workings of that network and the number of people involved with it, "it was well within the discretion of the trial judge to permit such testimony on the theory that [Agent Dockery's] specialized knowledge would

20

assist the trier-of-fact in understanding the evidence." Id. at 1474.

We also agree that the testimony was properly admitted under Fed. R. Evid. 704, which allows for the admission of opinion testimony even though it "embraces an ultimate issue to be determined by the trier of fact." A.E. By and Through Evans v. Independent School Dist. No. 25, 936 F.2d 472, 476 (10th Cir. 1991) (citations omitted). Mr. McSwain maintains that Agent Dockery's reference to the indictment impermissibly told the jury what result to reach. We disagree. Agent Dockery's testimony did not overstep the bounds of permissible expert testimony because it addressed a specific factual question: that is, Mr. McSwain's involvement in the piperidine scheme. See Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988) (concluding that "the [expert] witness did not invade the court's authority by discoursing broadly over the entire range of the applicable law" because his testimony "focused on a specific question of fact"). Moreover, the testimony's probative value in explaining the piperidine distribution network outweighed any potential for prejudice. See Fed. R. Evid. 403.

**D.     Singleton claim**

Mr. McSwain also argues on appeal that the prosecutor violated 18 U.S.C. § 201(c)(2) by entering into a plea agreement with a cooperating defendant. An en banc decision of this court resolved the issue against his position in United

States v. Singleton, 165 F.3d 1297 (10th Cir.) (en banc), cert. denied, 119 S.Ct. 2371 (1999). His claim therefore fails.

**E. Lesser Included Offense**

Mr. McSwain argues that his conspiracy conviction must be vacated because it is a lesser included offense of a continuing criminal enterprise conviction. See Rutledge v. United States, 517 U.S. 292, 300 (1996) (holding that conspiracy under 21 U.S.C. § 846 is a lesser included offense of continuing criminal enterprise under 21 U.S.C. § 848 and therefore ordering the conspiracy count vacated). The United States does not contest this issue and, after reviewing the record, we agree with Mr. McSwain.

**F. Pro Se Supplemental Brief**

We grant Mr. McSwain's motion to file an oversize supplemental brief and to supplement the record on appeal. After reviewing the brief, we find his arguments to be without merit. First, there is no Speedy Trial Act violation as Mr. McSwain waived his right to a speedy trial on April 7, 1997. See Rec. vol. I, doc. 397 (District Court Record). Second, Mr. McSwain was not denied due process when indicted on PCP offenses because the term PCP was used synonymously with phencyclidine at least as early as 1973. See, e.g., United

States v. Test, 486 F.2d 922, 924 (10th Cir. 1973), remanded on other grounds, 420 U.S. 28 (1975). As Mr. McSwain admits, phencyclidine was a controlled substance at the time of his violations.

Finally, because Mr. McSwain did not object to the introduction of his codefendants' guilty pleas at trial, we review the admission of this evidence for plain error. See Olano, 507 U.S. at 732. For several reasons Mr. McSwain has not established that the district court committed plain error.

First, with respect to all the witnesses but Mr. Williams, there was a proper purpose for the introduction of the guilty plea evidence – so the jury might consider it in evaluating the testifying codefendants' credibility. Further, there is no indication in the record that the prosecution improperly overemphasized the evidence, and the record also shows that defense counsel made use of the evidence to attempt to impeach the witnesses' credibility. See, e.g., Rec. vol. V, at 176, 221.

Most importantly, the court gave a cautionary instruction during the trial as to "the very limited purpose to which you can put evidence of the conviction of a witness for an offense in which a charge also is lodged against the defendant. It's proper for consideration on the issue of the credibility of the witness; it may not be used as a basis for drawing any inferences as to the guilt of the defendant." Rec. vol. V, at 181. And, in its final instructions to the jury, the court again

23

cautioned the jury that "[t]he possible guilt of others should enter into your deliberations only on the question of whether the government has proved beyond a reasonable doubt that a defendant in the case committed the crimes charged." See Rec. vol. I, doc. 415 (Jury Instruction No. 9). These instructions cured any potential prejudice. See United States v. Sanders, 929 F.2d 1466, 1470 (10th Cir. 1991) ("[A] cautionary instruction ordinarily is sufficient to cure alleged prejudice to the defendant.").

With respect to Mr. Williams, although we see no apparent legitimate purpose for the introduction of his guilty plea as evidence, the record shows the plea was referenced only once in passing. Therefore, in light of all of the evidence presented at trial, we are not convinced that any possible error as to Mr. Williams – or as to any of the other codefendants – had a "substantial influence on the outcome of the trial." United States v. Pedraza, 27 F.3d 1515, 1526 (10th Cir. 1994) (citation omitted). Moreover, we are not "in grave doubt as to whether it had such effect." Id. at 1526.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Mr. McSwain's convictions for engaging in a continuing criminal enterprise, engaging in interstate travel to facilitate narcotics distribution, possessing PCP and piperidine with the intent to

24

distribute it, and failing to file federal income tax returns. However, we REVERSE and REMAND with instructions to VACATE Mr. McSwain's conviction and sentence as to the narcotics conspiracy count. The motion to supplement the record is GRANTED. Because we conclude that the district court should vacate Mr. McSwain's conspiracy convictions, we do not address his challenge to his sentence on that charge. See Aplt. Br., at 47-50.