**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 13, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOHN CHARLES FLETCHER, a/k/a
Loc, a/k/a Big Loc,

Defendant - Appellant.

No. 11-6277

(W.D. Oklahoma)

(D.C. No. 5:09-CR-00021-M-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **PORFILIO** and **ANDERSON**, Circuit Judges, and **BRORBY**, Senior
Circuit Judge.

---

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

of this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is

therefore ordered submitted without oral argument.

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

Defendant and appellant, John Charles Fletcher, was found guilty following a jury trial on thirty-nine counts of violating various federal drug laws. He received multiple concurrent sentences, one of which was for life imprisonment. Fletcher appeals his conviction and sentence. We affirm.[1]

## BACKGROUND

In August of 2006, Agent Clayton Simmonds of the Federal Bureau of Investigation ("FBI") received a tip that there was considerable drug activity in the Garden Days and Garden Oaks neighborhoods of Oklahoma City. Using both traditional investigative techniques and a Title III wiretap, FBI agents discovered there were many people, including Fletcher, selling narcotics in those neighborhoods. The agents determined that Fletcher was a wholesale distributor and had distributed cocaine since 2003.

Agents identified six other individuals significantly involved in these drug activities: Kevin Wright, Kimberly Brannon, Jerroll Marshall, Kenneth Miles, LaTonya Ellison and Lenora Wright (no relation to Kevin). After filing an initial indictment against Fletcher and others, the government eventually filed a superseding indictment against Fletcher alleging thirty-nine crimes: count 1 (conspiracy to possess with intent to distribute cocaine base, in violation of 21

---

[1]We construe Appellee's Motion to Withdraw as Counsel of Record as a motion for substitution, and we hereby grant the motion.

U.S.C. § 846); counts 2, 3, 12, 34, 37, 38 and 39 (distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1)); counts 4,15, 20, 23 and 26 (possession with intent to manufacture cocaine powder, in violation of 21 U.S.C. § 841(a)(1)); counts 5, 10, 16, 21, 24, 27, 31, and 35 (manufacturing cocaine base, in violation of 21 U.S.C. § 841(a)(1)); counts 6, 17, 22, 25, 28, 32 and 36 (possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1)); counts 7 and 19 (felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1)); counts 8, 11 and 13 (distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1)); count 9 (possession with intent to manufacture cocaine powder, in violation of 21 U.S.C. § 841(a)(1)); count 14 (managing a residence for the purpose of manufacturing/distributing cocaine base, in violation of 21 U.S.C. § 856(a)(2)); counts 18, 29 and 33 (distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1)); and count 30 (possession with intent to distribute cocaine powder, in violation of 21 U.S.C. § 841(a)(1)).[2]

The broad contours of the charged drug conspiracy and related activities were determined as follows: A confidential witness ("CW") initially informed the FBI that Fletcher and Kevin Wright had been selling large quantities of narcotics in the Garden Days/Garden Oaks subdivision. Both Fletcher and Wright were members of the Shotgun Crips gang. The CW provided agents with the telephone

---

[2]The other conspirators were also prosecuted. A co-conspirator, Tuesday Shalon Johnson, was a co-defendant with Fletcher. She, however, pled guilty at some point.

number Wright used to conduct narcotics transactions. On August 10, 2006, the CW made a controlled purchase of crack cocaine from Wright.

Several other CWs provided similar information on Fletcher and Wright. Some of these CWs made controlled purchases of cocaine, crack cocaine and PCP from Fletcher and Wright. Several of these purchases were made at an address in Oklahoma City listed as belonging to Fletcher, and which he rented to Lenora Wright, a co-conspirator who was ultimately convicted and sentenced to sixty months' imprisonment.

In July of 2008, a court authorized a Title III wiretap on Wright's cellular phone. Agents heard conversations among the co-conspirators from that date until the wiretap was discontinued on September 4, 2008.

During the course of the investigation described above, law enforcement agents interviewed Wright on several occasions and learned that Wright had been purchasing narcotics from other members of the conspiracy since 1993. Wright purchased narcotics from Fletcher and others, including Tuesday Johnson, Michael Thompson, Keno Fletcher and Karl Madison. These purchases included cocaine, crack cocaine and PCP. Wright then took the narcotics purchased and sold them to other distributors and/or users in the Oklahoma City area. Various members of the conspiracy, including Fletcher, relied upon each other to keep their drug supplies sufficient for their customers. They, including Fletcher, often "cooked up" or "rocked up" powder cocaine to create crack cocaine. Law

enforcement authorities determined that the conspiracy continued from at least January 1993 through September 3, 2008. Between those dates, agents seized approximately 755.1 grams of cocaine, 847.75 grams of crack cocaine and 77 milliliters of PCP.

As indicated above, Fletcher was found guilty by a jury of all thirty-nine counts of the superseding indictment. In preparation for sentencing under the advisory United States Guidelines Commission, Guidelines Manual ("USSG"), the presentence report ("PSR") calculated a total offense level of 38. After upward adjustments for obstruction of justice, being an organizer or leader of the conspiracy and possessing a firearm, Fletcher's total offense level was 46. With a criminal history category of VI, the advisory Guidelines sentence was life imprisonment.

Fletcher objected to the drug quantity calculation and to the upward adjustments for being an organizer or leader and obstructing justice. The probation officer rejected these challenges. The district court overruled Fletcher's objections to the upward adjustments, and concluded that his other objections were either moot or would have no effect on the advisory sentencing Guidelines range. The district court sentenced Fletcher to life imprisonment.

Fletcher appeals, arguing (1) his rights under the Speedy Trial Act were violated; (2) the evidence was insufficient to support his conviction; (3) FBI

Agent Simmonds gave improper "overview" testimony; and (4) Fletcher's sentence was improperly calculated because he was not a leader/organizer.

**DISCUSSION**

### I. Speedy Trial Act

On June 30, 2009, Fletcher filed a motion to dismiss the case against him on the ground that his right to a speedy trial had been violated. The district court denied that motion.

The Speedy Trial Act, 18 U.S.C. §§ 3161-3174, requires that a defendant be tried "within seventy days from the filing date (and making public) of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). But the Act also contains "a long and detailed list of periods of delay that are excluded in computing the time within which the trial must start." Zedner v. United States, 547 U.S. 489, 497 (2006). Thus, any period of delay resulting from other proceedings involving the defendant, including delay resulting from a pretrial motion, is excludable from the seventy-day period of the Speedy Trial Act. See 18 U.S.C. § 3161(h)(1)(D); United States v. Tinklenberg, 131 S. Ct. 2007, 2010-16 (2011) (holding subsection (h)(1)(D) stops the Speedy Trial Act clock upon filing of a pretrial motion, regardless of whether the motion has any impact on the trial setting). Additionally, a "reasonable period of delay"

attributable to the proceedings of a co-defendant is excludable.  See 18 U.S.C. § 3161(h)(6).

"Much of the Act's flexibility is furnished by § 3161(h)[(7)], which governs ends-of-justice continuance."  Zedner, 547 U.S. at 498; see United States v. Toombs, 574 F.3d 1262, 1276 (10th Cir. 2009) (Tymkovich, J, dissenting in part; concurring in part).[3]  This provision excludes "[a]ny period of delay resulting from a continuance granted by any judge . . . on the basis of . . . findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7).  It "gives the district court discretion – within limits . . . – to accommodate limited delays for case-specific needs."  Zedner, 547 U.S. at 499.

We and other courts have repeatedly emphasized, however, that in granting an ends-of-justice continuance, the district court must set forth, "in the record, either orally or in writing, its reasons for findings that the ends of justice served by the granting of such [a] continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).  "Without on-the-record findings there can be no exclusion under § 3161(h)([7])."  Zedner, 547 U.S. at 507; see United States v. Rushin, 642 F.3d 1299, 1303 (10th Cir. 2011), cert. denied, 132 S. Ct. 1818 (2012).  Finally, the statute is "not self-executing."

---

[3]Before the 2008 amendments to the Speedy Trial Act, subsection (h)(7) appeared as subsection (h)(8). See Pub. L. No. 110-406, § 13, 122 Stat. 4291 (2008).  After the amendment, the subsection remained substantively unchanged.

-7-

United States v. Zajac, 2012 WL 1959464, at *7 (10th Cir. June 1, 2012) (unpublished).[4]  "[T]he defendant bears the burden of asserting a violation of the statute."  Id.  And "[t]he court will not consider such issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." United States v. Wooten, 377 F.3d 1134, 1145 (10th Cir. 2004).

"We apply an abuse of discretion standard to a district court's decision to grant an ends-of-justice continuance. . . ."  Toombs, 574 F.3d at 1268 (further quotation omitted).  We review de novo, however, the district court's compliance with the legal requirements of the Speedy Trial Act.  Id.  "The district court's factual findings are reviewed for clear error."  Id.

Both parties agree that the district court correctly held that the seventy-day Speedy Trial period commenced on March 17, 2009, the day Fletcher made his initial appearance before a magistrate.  Seventy days after that date is May 26, 2009.  Fletcher's jury trial actually commenced on April 18, 2011.  Thus, absent excludable periods, Fletcher's Speedy Trial Act rights were violated because his trial commenced some 761 days after his initial appearance.

The government argues that all but forty-two days are automatically excludable from the Speedy Trial Act provisions.  The record reveals numerous motions which tolled the Speedy Trial Act clock.  On March 19, 2009, Fletcher's

_____

[4]We note that unpublished decisions are not binding authority, but we cite this case because we adopt its reasoning as stated.

-8-

co-defendant, Tuesday Johnson, filed a motion to suppress the information gathered from the wiretap, a motion for a hearing under United States v. James, 590 F.2d 575, 582 (5th Cir. 1979),[5] and a motion to sever. The district court set the James hearing for May 11, 2009. Ms. Johnson pled guilty on May 6, 2009, before the James hearing took place, and the district court therefore never ruled on her pending motion to sever. While the district court did not exclude all of that time period while those motions were pending (forty-nine days, if we assume the Speedy Trial clock commenced again on May 7, after Ms. Johnson pled guilty), we agree with the government that the entire period while Ms. Johnson's motions were pending and she was a co-defendant is excludable. See United States v. Gutierrez, 48 F.3d 1134, 1136 (10th Cir. 1995).

Next, on May 8, 2009, Fletcher filed a motion to continue the trial, which the district court granted on May 11, 2009. On May 13, 2009, he filed a *pro se* motion to dismiss, which the district court struck on May 21, 2009, because Fletcher was represented by counsel. The time period while those motions were pending (four days and nine days, respectively) is excludable. 18 U.S.C. § 3161(h)(1)(D). On May 14, 2009, Fletcher filed a motion to suppress information gathered from the wiretap and a motion for a James hearing. The

---

[5]As we have noted previously, "[u]nder Tenth Circuit Law, a district court can only admit co-conspirator statements if it holds a James hearing or conditions admission on forthcoming proof of a predicate conspiracy through trial testimony or other evidence." United States v. Townley, 472 F.3d 1267, 1273 (10th Cir. 2007) (internal quotation marks and citation omitted).

<u>James</u> hearing took place on June 3, and the court granted-in-part and denied-in-part the motion to suppress on June 9.  This twenty-seven-day period is also automatically excludable.  On June 8, 2009, Fletcher filed another *pro se* motion to dismiss, which the district court struck on June 15 because he was represented by counsel.  This eight-day period is excludable.  Fletcher's motions to dismiss for violating the Speedy Trial Act and to quash the indictment were pending from June 30, 2009, until July 23, 2009, an excludable twenty-four day period.

Finally, on July 30, 2009, Fletcher filed another motion for a <u>James</u> hearing.  The district court granted the motion on August 13, 2009, and ultimately set the hearing for September 28, 2009.  As a result of numerous intervening events, including a psychiatric evaluation, three *pro se* interlocutory appeals, and a motion filed by Fletcher for a bill of particulars, the court did not hold the <u>James</u> hearing until March 29, 2011, some 608 days after the motion was filed.  This period is excludable.  The government grosses up the time periods as follows:  "The [Speedy Trial Act] does not automatically exclude the 42-day balance covering March 18, 2009, May 7, 2009, May 12, 2009, June 16-29, 2009 July 24-29, 2009, and March 30, 2011 – April 17, 2011."  Appellee's Br. at 24.  The record supports the government's calculations.  While a number of motions and proceedings overlap, and involve a co-defendant whose record is not before us, we calculate that the Speedy Trial Act clock was only running for twenty-eight of the seventy days following Fletcher's appearance.

Additionally, the court granted several continuances under the ends-of-justice provision of the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A). First, on May 8, 2009, Fletcher filed a motion to continue the trial, which the district court granted on May 11, 2009, resetting Fletcher's trial date to June 8, 2009. The period (May 8-11) while that motion was pending is excludable. On May 27, Fletcher filed a *pro se* motion to appoint new counsel. On May 28, 2009, the government filed a motion for a continuance, which the district court granted on May 29, 2009, and continued the James hearing until June 3, 2009. At the hearing on June 3, the district court granted Fletcher's motion for new counsel and continued the trial to the July 2009 trial docket. This again tolled the Speedy Trial Act clock. On June 30, 2009 (and again on July 1, 2009) Fletcher filed motions to continue the trial, which the district court granted on July 2, resetting the trial for the court's August 2009 trial docket.[6]

Considering the properly excluded motions by Fletcher himself, his counsel and his co-defendant, as well as the district court's ends-of-justice continuances, the district court correctly held that Fletcher's speedy trial rights were not

---

[6]Other motions included a request by defense counsel, on September 21, 2009, for a psychiatric examination to see if Fletcher was competent to assist in his own defense. On September 28, 2009, the district court granted that motion. After conducting a hearing and receiving expert medical evidence, the court, on January 27, 2010, found Fletcher to be competent. Time taken to determine a defendant's competency to stand trial is automatically excluded from the seventy-day Speedy Trial Act requirement. 18 U.S.C. § 3161(h)(1)(A).

violated.[7]

---

[7]We note that Fletcher also argues that the district court failed to make adequate findings as to why the continuances granted were necessary under the ends-of-justice provision. "Th[e] [ends-of-justice] exception to the otherwise precise requirements of the Act was meant to be a rarely used tool for those cases demanding more flexible treatment." Toombs, 574 F.3d at 1269 (further quotation omitted). The district court must make adequate findings as to the necessity of such a continuance.

> The requirement that the district court make clear on the record its reasons for granting an ends-of-justice continuance serves two core purposes. It both ensures the district court considers the relevant factors and provides this court with an adequate record to review. Failure to address [the reasons] on the record creates the unnecessary risk of granting continuances for the wrong purposes, and encourages overuse of this narrow exception. Thus, the record must clearly establish the district court considered the proper factors at the time such a continuance was granted.

Id. (further quotations omitted). Thus, the record "must contain an explanation of why the mere occurrence of the event identified by the party as necessitating the continuance results in the need for additional time." Id. at 1271. "A record consisting of only short, conclusory statements lacking in detail is insufficient." Id. As we stated in a prior case finding the district court's explanation for a continuance inadequate:

> Although the district court . . . mentioned the presence of new counsel in its . . . order, it did not issue findings specifically addressing [defendant's] stated grounds for a continuance, i.e., his new counsel's claimed need for time to familiarize himself with the case. Nor did the district court otherwise comment on the issue of trial preparation time. Furthermore, the court's order does not so much as hint that it weighed the proper factors under the Act. Indeed, the court failed to cite the Act's ends-of-justice provision.

United States v. Williams, 511 F.3d 1044, 1058 (10th Cir. 2007).

The district court's orders granting continuances in this case are perilously close to the inadequate orders in Williams. Not only does the court fail to cite the

(continued...)

## II. Sufficiency of the Evidence

Fletcher next argues there was insufficient evidence supporting his conviction on the conspiracy charge. He also argues ineffectiveness of his trial counsel, an argument which he candidly admits normally may not be brought on direct appeal.

"We review the sufficiency of the evidence to support a jury verdict *de novo* and examine only whether taking the evidence, both direct and circumstantial, in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Phillips, 583 F.3d 1261, 1264 (10th Cir. 2009) (internal quotation marks omitted). "We reverse a conviction only if no reasonable jury could have reached the challenged verdict." United States v. Hooks, 551 F.3d 1205, 1212 (10th Cir.

_____

[7](...continued)
ends-of-justice provision, it fails to give any explanation as to why counsel needs more time to familiarize himself with the case, nor how long the continuance should be, nor does it "hint" at the required factors under the Act.

Nonetheless, the continuances sought by Fletcher, and granted by the district court, were expressly granted to enable new counsel to familiarize themselves with this case. With a thirty-nine count indictment, and at least one co-defendant for a time, the record in this case is self-explanatory as to why the district court believed a continuance was warranted when Fletcher sought new counsel.

We need not resolve whether the continuances were adequately explained in this case, however, because Fletcher filed other motions, as did his co-defendant, in the same general time-frame as these granted continuances. The Speedy Trial Act was not violated, even if we do not exclude the periods of time covered by the continuances.

2009).  "In reviewing the evidence in this light, we do not inquire into the jury's credibility determinations or its conclusions regarding the weight of the evidence."  United States v. Kaufman, 546 F.3d 1242, 1263 (10th Cir. 2008).

"To obtain a conspiracy conviction, the government must prove (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among coconspirators."  United States v. Foy, 641 F.3d 455, 465 (10th Cir.), cert. denied, 132 S. Ct. 467 (2011).  An agreement to distribute drugs may be inferred from the facts and circumstances of the case.  Id.  To establish the existence of a conspiracy, "mere presence" or "mere association with conspirators known to be involved in crime" is insufficient.  Id.  Similarly, "the government must do more than show there were casual transactions between the defendant and the conspirators."  Id. (quoting United States v. Caldwell, 589 F.3d 1323, 1331 (10th Cir. 2009) (further quotations omitted)).

Fletcher specifically argues that the government failed to show interdependence among other conspirators and himself.  He also argues that the government's case largely rested on testimony which was "unworthy of belief on its face" because it came from people who were "drug addicts/dealers, were under prosecution and threat of imprisonment when they testified, sought leniency for themselves in exchange for testifying against Fletcher, almost all were convicted

felons, and none of the fantastic testimony they gave could be corroborated by physical evidence or admissions by Fletcher." Appellant's Br. at 35.

### A. Interdependence

Interdependence "requires proof that the conspirators intended to act together for their shared mutual benefit within the scope of the conspiracy charged." United States v. Hamilton, 587 F.3d 1199, 1208 (10th Cir. 2009) (emphasis and quotations omitted). "The requirement is satisfied if the alleged coconspirators were united in a common unlawful goal or purpose and if a defendant's activities facilitated the endeavors of another alleged coconspirator or facilitated the venture as a whole." Id. (emphasis and quotations omitted); see also United States v. Edwards, 69 F.3d 419, 431 (10th Cir. 1995) ("[I]nterdependence exists where each co-conspirator['s] activities constituted essential and integral steps toward the realization of a common, illicit goal."). The interdependence element does not, however, require proof "the coconspirators know the identities or details of each scheme or have connections with all other members of the conspiracy." Foy, 641 F.3d at 465 (quotations omitted). "[The] buyer-seller relationship is patently an interdependent one." United States v. Wright, 506 F.3d 1293, 1298-99 (10th Cir. 2007).

Fletcher claims the government failed to prove interdependence because he and Wright (the most significant person charged as a co-conspirator) were

independent, each conducting his own business without agreements or reliance on each other.

The evidence in this case was sufficient to demonstrate interdependence. For example, Brannon testified that she bought cocaine from Fletcher, and Fletcher knew she planned to sell it as well. Trial Transcript at 149, R. Vol. 1 at 149. Wright similarly testified that he bought cocaine from Fletcher, and Fletcher knew he planned to resell it. Id. at 412-14. Brannon testified that Fletcher called her to set up a drug buy because she was a "good source of income." Id. at 171. She and Wright both testified that Fletcher became virtually their exclusive provider of drugs. Id. at 153, 370. Brannon also related an incident when she provided Fletcher with nine ounces of crack cocaine because he was unable to purchase it from anyone else. Id. at 157-58.

Further evidence of interdependence came from the testimony as to Fletcher's interactions with LaTonya Ellison, Kenneth Miles and Lanora Wright. Several individuals testified that Fletcher did not himself use cocaine. Id. at 412, 552, 633-34. He accordingly relied upon Ellison, Miles and Ms. Wright (all admitted crack addicts) to test the quality of the crack cocaine that Fletcher cooked from powder. Id. Those three also obtained ingredients necessary to cook crack cocaine when Fletcher needed a particular item, and occasionally supplied him with customers. Id. at 387, 397, 565, 575, 624, 632, 681-82. Ms. Wright

also related that she would warn Fletcher if the police were nearby, because she "didn't want him to get caught" and end her supply of crack. Id. at 693-94.

There was other evidence of interdependence: Fletcher cooked crack at the residences of Miles and Ellison and Ms. Wright. Id. at 392, 487-88, 567, 625. In return, they obtained crack from Fletcher. Jerroll Marshall testified that he taught Fletcher how to cook crack cocaine from powder, which enabled Fletcher to then cook his own crack cocaine utilizing a method which maximized the volume of the finished product. Id. at 272-73. We agree with the government that, between the evidence of individuals reselling the crack manufactured by Fletcher and those assisting Fletcher in the manufacture of crack, there was sufficient evidence from which the jury could find interdependence beyond a reasonable doubt.

### B. Credibility of Witnesses

Fletcher also argues that virtually all the witnesses who testified against him were unworthy of belief because they were drug addicts or dealers, were themselves being prosecuted, and therefore had a motivation to testify favorably toward the government, and were otherwise not credible. We have previously stated that "our function as a court of review prevents us from re-weighing the testimony and coming to a conclusion at odds with the one reached by the jurors." United States v. Mendez-Zamora, 296 F.3d 1013, 1018 (10th Cir. 2002) (further quotation omitted). Thus, "[w]e will not hold that testimony is, as a matter of law, incredible unless it is 'unbelievable on its face, i.e., testimony as to facts that

-17-

[the witness] physically could not have possibly been observed or events that could not have occurred under the laws of nature.'" Id. (quoting Tapia v. Tansy, 926 F.2d 1554, 1562 (10th Cir. 1991)). Similarly, we have declared that a "fact-finders's credibility determinations are 'virtually unreviewable on appeal.'" United States v. Cardinas Garcia, 596 F.3d 788, 795 (10th Cir. 2010) (quoting United States v. Virgen-Chavarin, 350 F.3d 1122, 1134 (10th Cir. 2003)). We therefore decline to declare the witnesses in this case not credible.

Additionally, defense counsel thoroughly explored the criminal history and charges pending against each witness. The jury was accordingly aware of their status when they testified. This argument provides no basis for attacking the jury's verdict in this case.

With respect to Fletcher's ineffective assistance of counsel claim, we have stated that "[i]neffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal. Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed." United States v. Galloway, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc). "[E]ven if the record appears to need no further development, the claim should still be presented first to the district court in collateral proceedings . . . so the reviewing court can have the benefit of the district court's views." Id. We see no reason to depart from that general rule in this case.

### III. Testimony by FBI Agent

FBI Agent Clay Simmonds was the first witness to testify for the government, and he provided an "overview" of the entire conspiracy, including testifying as to the participants, their roles and various drug activities. Fletcher characterizes this testimony as follows: "Agent Simmonds' testimony is lengthy, and it covers all of the Government's witnesses, and many characters and drug dealers/users not used as witnesses in this case, and he actually tells the jury how the 'operation' worked, as the Government saw it, including the hierarchy of the group of conspirators, with Fletcher, Wright, and Mike Thompson being at the top." Appellant's Br. at 40. He also claims that Agent Simmonds relied upon hearsay and other impermissible information. Finally, relying on two cases from the First Circuit Court of Appeals, Fletcher argues Simmonds' testimony constitutes reversible error. See United States v. Vazquez-Rivera, 665 F.3d 351 (1st Cir. 2011); United States v. Meises, 645 F.3d 5 (1st Cir. 2011).

"We review a district court's decision to admit expert or lay testimony for an abuse of discretion." United States v. McSwain, 197 F.3d 472, 482 (10th Cir. 1999). Further, "[t]he court's ruling cannot be overturned unless it is manifestly erroneous." Id. (further quotations omitted).

Relying heavily on Meises, Fletcher argues that we should follow the First Circuit's authority condemning "testimony from an agent, not based on personal knowledge, describing the roles played in the drug conspiracy by individual

-19-

defendants." Meises, 645 F.3d at 13. The Meises court found that "[s]uch descriptions amount to impermissible testimony from the agent 'that each of the defendants was guilty of the conspiracy charged.'" Id. (quoting United States v. Casas, 356 F.3d 104, 119 (1st Cir. 2004)).

Fletcher lists five specific instances when he claims Agent Simmonds gave improper testimony during direct examination. First, Fletcher argues that Simmonds provided hearsay testimony and/or testimony as to something of which he had no personal knowledge when he testified that one of Fletcher's cocaine suppliers was Richard Liggins. Trial Transcript at 17, R. Vol. 3 at 17. After Fletcher objected to this as hearsay, the court reminded the government not to elicit hearsay testimony, but noted that it would permit some overview testimony by Simmonds provided it "was within his personal knowledge." Id. at 20.

Second, Simmonds testified that Wright had a number of "retail" customers, and he listed them by name. Id. at 21-22. Third, Simmonds testified that a cell phone purportedly belonged to Fletcher, but it was not registered to him, which Simmonds said is "common . . . in the narcotics industry." Id. at 40. Fourth, Simmonds testified as to who spoke in the wiretapped calls to Wright's phone, and further testified that Wright helped agents understand what was being said on that phone. Id. at 45-50. Defense counsel made several hearsay objections to this testimony, which the district court overruled. Finally,

Simmonds testified as to his receipt of information about the presence of firearms. Id. at 53-57.[8]

We agree with the government that this is not prohibited "overview" testimony which usurped, or unduly impacted, the jury's role in determining the facts. Simmonds stated his testimony was based on information he obtained from the wiretap, interviews he conducted, surveillance, and the controlled buy in which he participated. He did not use inadmissible or improper sources. Moreover, we have stated, unlike the court in Meises, that "testimony as to the roles played by participants in a[n] . . . operation [is permissible], [and] 'other courts have permitted law enforcement witnesses to provide both lay and expert opinions concerning the roles played by participants in a variety of illegal activities. . . .'" McSwain, 197 F.3d at 482 (quoting United States v. Pinelli, 890 F.2d 1461, 1474 (10th Cir. 1989)). With respect to Simmonds' testimony about an unregistered cell phone being commonly used in drug crimes, we have consistently permitted law enforcement agents to provide expert testimony concerning the drug trade. See, e.g., United States v. Sturmoski, 971 F.2d 452,

---

[8]Fletcher cites this portion of Simmonds' testimony as showing Simmonds improperly testifying that he had received information that Fletcher himself carried weapons. In fact, this part of Simmonds' testimony only relates that Simmonds gained "information with regard to firearms." Trial Transcript at 54, R. Vol. 3 at 54. There is no specific mention of Fletcher. At other places in the trial, various witnesses testified as to their observations of Fletcher with different weapons.

459 (10th Cir. 1992) (testimony concerning tools of the drug trade). The district court did not abuse its discretion in permitting Agent Simmonds' testimony.[9]

## IV. Sentence

Fletcher's final argument is that his sentence is unreasonable because the district court found that, under the Guidelines, he was a leader/organizer of a criminal activity involving five or more participants. We review a criminal sentence for reasonableness, applying a deferential abuse of discretion standard. United States v. Alapizco-Valenzuela, 546 F.3d 11208, 1214 (10th Cir. 2008). This reasonableness has both a procedural and substantive component. Id. On appeal, although he does not articulate it in this way, Fletcher challenges the procedural reasonableness of his sentence, contending that the district court improperly calculated his Guidelines sentence because it incorrectly assessed the leader/organizer enhancement.

"We review for clear error the district court's finding that [the defendant] acted as a leader or organizer for purposes of [USSG] § 3B1.1." United States v. James, 592 F.3d 1109, 1113 (10th Cir. 2010) (further quotation omitted).

---

[9]We note that neither party makes an argument about any jury instruction relating to Simmonds' testimony. Fletcher does not argue that the court should have given a limiting instruction, nor does the government claim Fletcher failed to ask for such an instruction. The jury instructions given are not part of the record on appeal, although the government avers in its brief that the court gave "not only a general credibility instruction but also instructions regarding law enforcement witnesses." Appellee's Br. at 32. Fletcher does not refute that.

Accordingly, "we will not reverse the district court's finding unless, on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." Id. (further quotation omitted).

For the leader/organizer enhancement to apply, the government must prove by a preponderance of the evidence that the criminal activity involved five or more people and that the defendant was an organizer or leader over at least one of those individuals. United States v. Roberts, 14 F.3d 502, 523 (10th Cir. 1993). In determining if that standard is met, the Guidelines direct us to consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

USSG § 3B1.1(a) cmt. n.4. "Further, a defendant need not lead or organize at least five individuals. Rather, the criminal activity must include five or more participants (or be otherwise extensive). A defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant." United States v. Damato, 672 F.3d 832, 847 (10th Cir. 2012) (citing USSG § 3B1.1). "This is not a particularly onerous showing." Hamilton, 587 F.3d at 1222.

Fletcher does not challenge the finding that the conspiracy involved five or more people. The only issue is the finding that he was an organizer or leader of the conspiracy. In finding the § 3B1.1 enhancement applicable, the district court stated as follows:

> First of all, let me just recite regarding the first factor, exercising decision-making authority, the Court finds certainly that this Defendant had considerable authority over the conduct of LaTonya Ellison, over Lenora Wright, and over Kenneth Miles, by virtue of the relationship. They wanted what he had, the drugs, because they were all addicts, and he had ingress and egress, rights to their home, he could cook in their homes, he paid rent so he could use the homes for purposes of cooking, and in exchange they directed customers to him. He had considerable authority, and exercised it over many, those in particular.
>
> His participation, the Defendant's participation in the actual commission of the offense is extensive. He was quite controlling, he recruited a number of accomplices, another factor which this Court can consider. They, in exchange, directed customers to him, they bought supplies for him. He . . ., "he' being the Defendant, certainly claimed right to a larger share of the fruits of the crime, which is another factor this Court can look at to determine whether or not it is appropriate for the Court to assess additional points under the guideline for the leader-organizer role. The Court finds that it is appropriate in this case.

Sentencing Tr. at 20-21, R. Vol. 3 at 775-76. The district court's findings are amply supported by the record and are not erroneous. We therefore affirm Fletcher's sentence, which includes the § 3B1.1 enhancement.[10]

---

[10]Fletcher claims the district court's decision conflicts with our decision in United States v. Torres, 53 F.3d 1129 (10th Cir. 1995). We disagree. Torres is distinguishable. For one thing, the district court in Torres merely made a conclusory statement finding the organizer/leader enhancement applicable, noting
(continued...)

-24-

**CONCLUSION**

For the foregoing reasons, we AFFIRM the conviction and sentence in this case.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

---

[10](...continued)
that the defendant was the "engine" of the operation. The district court in this case clearly did more than make a conclusory statement about Fletcher's involvement. Moreover, we noted in <u>Torres</u> that "there was no evidence in the record the other coconspirators worked for [the defendant]." <u>Id.</u> at 1143. That is not the situation before us, where there was ample evidence of others working for Fletcher.

-25-